## Investigation Into Three Special Contracts Filed by New England Telephone and Telegraph Company, d\b\a Verizon

[779 A.2d 693]

No. 00-128

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed August 17, 2001

*Karen McAndrew* and *Elizabeth H. Miller* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, and *Victor D. Del Vecchio* and *Gregory M. Kennan* of *Bell Atlantic-Vermont*, Boston, Massachusetts, for Appellant.

*Kenneth W. Salinger* of *Palmer & Dodge LLP*, Boston, Massachusetts, *Mary E. Burgess, AT&T Communications of New England, Inc.*, New York, New York, and *Charles F. Storrow* of *Kimbell & Storrow*, Montpelier, for Appellee AT&T Communications of New England, Inc.

*Leslie A. Cadwell* and *Dixie Henry*, Montpelier, for Appellee Department of Public Service.

**Amestoy, C.J.** New England Telephone and Telegraph Company d/b/a Verizon appeals from an order of the Public Service Board denying approval of five special contracts between Verizon and individual business customers. Verizon claims that the Board erred in applying its pricing rules for special contracts by (1) requiring shared and common fixed costs to be included in the price floor of a special-contract service, (2) expanding the definition of a bottleneck facility to include facilities that are not essential to a competitor's ability to provide equivalent service, and (3) holding that volume discounts should generally be offered in the form of tariffed rates available to all customers rather than by special contract to individual customers. We affirm.

Until recently, telephone service in Vermont, like in most other states, was provided through regulated monopolies. Under this system, Vermont granted exclusive franchises to local exchange carriers. Verizon and its predecessors have operated the largest local exchange service in Vermont for many years. Advances in technology during the 1980s and 1990s, however, saw a trend toward regulated competition in the telecommunications industry, see e.g., 30 V.S.A. § 202c (general assembly finds that advances in telecommunications technology and changes in federal regulatory policy are rapidly reshaping telecommunications services; therefore, it enacts planning

and regulatory changes, including supporting competition, to direct benefits to all Vermonters), and as competition emerged, the Public Service Board has established policies and rules to govern both incumbents and competitors. Having operated in a monopoly environment, Verizon, the incumbent local exchange carrier, owns most of the facilities over which competitors must generally supply service. To promote competition, the Board has developed fair prices for the use of these facilities and pricing rules for Verizon that allow new carriers to compete fairly for customers.

At issue in this case are the Board's rules for imputing the price floor for Verizon's special contracts. In general, a schedule of the prices of the retail services offered by Verizon and other utilities must be filed with the Board, see 30 V.S.A. § 225(a), and cannot be unjustly discriminatory, see 30 V.S.A. § 218(a). The schedule shows the tariffed rates offered to all customers. Under 30 V.S.A. § 229, a utility must obtain Board approval for any contract for a "special product or special service not provided for or covered in the schedule." In this case, Verizon sought approval for five special contracts under 30 V.S.A. § 229. Three of the contracts provided individual business customers with volume discounts on instate toll service. The other two contracts were for Centrex business exchange services, which provide features such as abbreviated-digit intra-system calling, conference calling, call transfer, and call forwarding.

The main issue in the proceeding was whether Verizon had priced the contracts properly based on the price-floor standard required by previous Board decisions, which have required an incumbent carrier to price a service at or above a price floor equal to "the sum of the prices that it charges competitors for any bottleneck inputs required to provide the service and the TSLRIC [Total Service Long-Run Incremental Cost] of the non-bottleneck inputs for that service." *Investigation of Proposed Vt. Price Regulation Plan and Proposed Interim Incentive Regulation Plan of New England Tel. and Tel. Co.*, No. 5700/5702, slip op. at 122 (Vt. Pub. Serv. Bd. Oct. 5, 1994) (*Price Regulation Plan*). In other words, the Board has required Verizon to include in the price floor of special contracts, first, the price it charges competitors for use of any so-called bottleneck facilities, which are Verizon facilities required to provide the service. This rule is intended to put Verizon on an even footing with its competitors. Second, the Board has required Verizon to include in the price floor the total costs of the retail services. Preventing the incumbent local exchange carrier from pricing special contracts below the cost of providing the special-

contract service prevents it from using its monopoly services to subsidize special contracts and allows competing carriers, which have no monopoly services to subsidize special contracts, to compete fairly.

In this case, the Board rejected two of the volume discount contracts on the grounds that they failed to comply with price-floor requirements of previous Board decisions, and ordered Verizon to file revised price-floor calculations to conform to Board requirements for the other three contracts. The Board also held that volume discounts generally should be offered in tariffed rates available to all customers who qualify, rather than through special contracts to individual customers, unless the customer's usage is fundamentally different from other customers with similar volume usage.

Verizon appeals from the Board's decision. It does not dispute that the basic imputation standard establishes the price floor equal to the wholesale prices that Verizon would charge its competitors for any bottleneck inputs required to offer the same service, plus the Total Service Long-Run Incremental Cost of the nonnetwork inputs (TSLRIC). Rather, it challenges the Board's decisions that its toll service and Centrex service are bottleneck inputs and that the TSLRIC of the nonnetwork inputs must include shared and common fixed costs. Verizon also objects to the Board's ruling that volume discount cannot be offered by special contract but must be offered in tariffed rates.

We apply a deferential standard of review to decisions of the Public Service Board, which enjoy a strong presumption of validity. *In re Central Vt. Pub. Serv. Corp.*, 167 Vt. 626, 626, 711 A.2d 1158, 1159 (1998) (mem.). We will uphold the Board's findings and conclusions unless the appealing party demonstrates that they are clearly erroneous. *Id.* Further, we give great deference to the Board's expertise and informed judgment on findings of fact. *Id.*

### I. Shared and Common Fixed Costs

Verizon first claims that the Board erred in ordering it to include shared and common fixed costs in the price floor for services provided in the special contracts. Verizon claims that previous Board orders required only that special-contract prices exceed the TSLRIC, which Verizon claims the Board previously decided does not include shared and common fixed costs. Specifically, Verizon contends that *Investigation into NET's Tariff Filing re: Open Network Architecture*, No. 5713 (Vt. Pub. Serv. Bd. May 29, 1996) (*NET's Tariff Filing*), held that neither common costs nor shared fixed costs are properly included in

TSLRIC. Thus, Verizon maintains that the Board arbitrarily and capriciously violated its own pricing rules by requiring Verizon to include common and shared fixed costs in the price floors for the five contracts at issue here. The Department of Public Service and intervenor AT&T Communications of New England dispute Verizon's position.

We begin by explaining that common and shared fixed costs are costs that are not associated with any particular product or service, such as land, buildings and other facilities, as well as legal and general administrative functions that would arise with or without the special contract. In contrast, service-specific costs are those costs directly caused by providing the service, in this case, the services specified in each special contract. Verizon's position is that the price floor should be determined by the cost of providing the special-contract service but that the individual special-contract customers should not have to bear any of the shared and common costs of the company because this would be inconsistent with prior Board decisions. Accordingly, we turn next to the Board precedent.

In *NET's Tariff Filing*, the Board held that the retail prices charged by incumbent local exchange carriers should include the TSLRIC and an appropriate markup for common costs and accounting profits. *Id.* at 41 (holding that the incumbent local exchange carrier's retail prices should be set according to equation (1) on page 34, which states that the retail price for a local exchange equals TSLRIC plus "a markup for common costs and accounting profits"). Thus, contrary to Verizon's contention, *NET's Tariff Filing* did not hold that common costs are excluded from the price-floor equation.

It is true that the Board's decision in this case could create some confusion because rather than reiterating the price-floor rule from *NET's Tariff Filing* — TSLRIC plus markup — it describes the price-floor as TSLRIC including a reasonable share of joint and common costs. Nonetheless, whether the shared and common fixed costs are included in TSLRIC or added to TSLRIC as a markup makes no difference in the final price-floor computation; it is a mere difference of nomenclature. Thus, we find no merit in Verizon's claim that the Board erred by including shared and common fixed costs in the calculation of TSLRIC in this case. The price-floor calculation was the same in *NET's Tariff Filing*, and it included shared and common fixed costs. Accordingly, we reject Verizon's contention that the Board arbitrarily and improperly contradicted its precedent by expanding upon the categories of costs that Verizon must include in the price floor.

■ Further, requiring Verizon to impute the shared and common fixed costs in its special contracts is consistent with the Board's goal in creating pricing rules to encourage competition because it prevents Verizon from using revenues from monopoly services to subsidize special contracts subject to competition. Allowing Verizon to exclude overhead costs from special contracts would necessarily require Verizon's monopoly customers to cover these costs. As such, it would allow Verizon to subsidize its special contracts with monopoly revenues and would allow Verizon to undercut competitors that have no monopoly customers to subsidize their special contracts. Accordingly, Verizon's position is contrary to the Board's goals of promoting competition in telecommunications by creating a level playing field and preventing cost shifting to monopoly customers.

## II. Bottleneck Facilities

■ Verizon contends that the Board's application of the bottleneck prong of its imputation rule conflicts with its definition of a bottleneck facility, departs from its precedent — *NET's Tariff Filing* in particular — defies well-accepted principles of law and economics and will hamper competition in Vermont. Verizon maintains that competitive alternatives exist for both toll access service and business exchange services. Because no Verizon facilities are essential to obtaining either service, Verizon contends that neither is a bottleneck input.

In *NET's Tariff Filing*, the Board adopted a three-part definition for a bottleneck facility: (i) the facility is essential to the supply of some other service, (ii) the facility is exclusively supplied by the provider in question, and (iii) the provider and competitor compete with one another in the supply of some other service for which the facility in question is an essential input. *Id.* at 19 n.54. The decision further states that "the standard should be met throughout the service area of a given service provider (or the relevant area to which the service obligation applies). That is, an obligation to unbundle should apply throughout a service area to which it is offered, if it remains a monopoly facility in a portion of that service area." *Id.* Finally, the decision states that "the standard of 'exclusively supplied' should recognize the practical economic impediments associated with accessing realistic competitive alternatives; that is, the access to an alternative provider should not merely be a theoretical one, but a practical one as well." *Id.*

In this case, the Board clarified that "even if the test for a particular input is no longer met throughout an incumbent's entire service territory (or the relevant area to which the service obligation applies), the input would not necessarily lose its classification as a bottleneck." The Board has not required other facilities-based providers to unbundle their networks; consequently, nonfacilities-based providers may not be able to purchase bottleneck inputs from any company but the incumbent. In such circumstances, it would be inappropriate to relieve the incumbent of the bottleneck prong of its imputation obligation because this would effectively bar all other competitors from the market. Thus, the Board concluded that "the presence of a single or small number of alternative facilities-based providers does not, by itself, establish that a particular market is competitive." Applying this analysis to toll special contracts, it held that the presence of a single facilities-based competitor that serves limited geographic areas and is not required to make its facilities available to other competitors was not sufficient for Verizon to remove the bottleneck imputation for these services.

Concerning the Centrex contracts, the Board found that "Centrex facilities are a classic case of a service with a 'sole-source provider.' " Although there is competition from customer-based facilities, such as PBX and key systems, which offer similar features, any other competitor seeking to compete with Verizon for Centrex services would need to purchase such services from Verizon or construct its own facilities. The imputation standard is intended to avoid such uneconomic investment. Further, the Board recommended that if the imputation of unbundled-network prices does not allow Verizon to compete with customer-based facilities for business exchange services, Verizon could develop separate unbundled-network rates specific to the class of customers who typically purchase Centrex services rather than calculating them on average for all customers.

Verizon contends that the Board erred in concluding that toll and business exchange services are bottlenecks because neither service is exclusively provided by Verizon. Verizon focuses on the definition that the Board adopted in *NET's Tariff Filing*, which required that the input be "exclusively provided" by the provider in question to qualify as a bottleneck. The definition in *NET's Tariff Filing* was, however, not as narrow as Verizon contends, and the requirements for showing that a facility is no longer a bottleneck were not limited to the definition. As the Board stated in that case, it takes a practical approach in determining whether a facility is no longer a bottleneck;

there must be "viable competitive alternatives" throughout the incumbent's service area. *Id.* at 19 n.54. "Unbundling obligations should continue until such time as a market for a feature is truly competitive." *Id.* at 25. Accordingly, we reject Verizon's contention that the Board was arbitrary and acted contrary to its precedent by concluding that toll and business exchange services are bottlenecks although they are no longer exclusively provided by Verizon. That is not the Board's test.

■ Similarly, we find no clear error in the Board's application of its bottleneck analysis. The burden of proving that a facility or input is no longer a bottleneck rests on the incumbent carrier. *Id.* at 21 n.69. First, Verizon challenges the Board's conclusion that Verizon did not meet its burden of showing that its special access for toll service is no longer a bottleneck. The Board found that a single facilities-based competitor that serves limited geographic areas — and is not required to make its facilities available to other competitors — does not show that this input is no longer a bottleneck. All other competitors rely on Verizon facilities to provide this service. Consequently, the Board concluded that the input was still subject to the bottleneck imputation standard. This decision was consistent with *NET's Tariff Filing*; except for the single facilities-based competitor serving a limited area, competitors have no viable competitive alternative to purchasing these inputs from Verizon. The input is therefore not truly competitive. On this record, we conclude that the Board's decision was consistent with its precedent and its requirements for showing that facilities are no longer bottlenecks. The decision was, therefore, not arbitrary, and we need not decide whether such inconsistency, if present, would provide any legal basis for reversal.

■ Second, Verizon challenges the Board's conclusion that it did not meet its burden of proving that Centrex services are no longer a bottleneck input. We understand Verizon's claim that in providing Centrex services, it must compete with others providing customer-based business exchange services, such as PBX and key systems. Nonetheless, it is the sole provider of Centrex services, and any competitor seeking to provide such service must purchase the inputs from Verizon. Thus, although the market is competitive at the retail level, the market is not truly competitive; PBX providers must compete with each other while Verizon has no competitor for providing Centrex services. While Verizon maintains that it is often unable to compete with PBX providers if it must impute the bottleneck price of

its Centrex service, the Board made recommendations that would allow Verizon to lower its rates to Centrex customers. On the record before us, we cannot conclude that the Board was clearly erroneous in deciding that Verizon failed to meet its burden of showing that Centrex services are no longer a bottleneck input.

Nor can we conclude, as Verizon urges, that the Board's decision is contrary to its policy to promote competition. As the Board noted, the important point is that the telecommunications market in Vermont is dominated by the incumbent carrier and new entrants rely in part upon the incumbent's network to offer their products. In this environment, it is critical to ensure that the incumbent does not use revenues from its monopoly services to support its competitive offerings. As the Board stated, "[i]mputation is the cornerstone of a pricing policy that protects against such 'cross-subsidization.'"

■ Finally, Verizon contends that the Board erred by imposing a statewide test to determine whether a facility is a bottleneck. The Board ruled that, to prove that a particular input is no longer a bottleneck, Verizon must show that the input no longer meets the Board's bottleneck test throughout Verizon's entire service territory. According to Verizon, "[t]he relevant market for determining whether a facility is a bottleneck is the competition for the contract itself, and no more." Given that competition in telecommunications has and will continue to develop unevenly over the entire state, Verizon contends that the statewide rule is extremely bad policy. For several reasons, we find no grounds for reversal.

First, the Board's decision is consistent with its precedent. As noted above, this statewide test was first enunciated in *NET's Tariff Filing* and was applied herein as set forth there. Second, even if we agreed with Verizon that it would be a better policy to determine the bottleneck issue on a contract-by-contract basis based on the services at issue, we would not reverse the Board's decision because such policy decisions are properly made by the Board. Verizon does not contend that bad policy-making is unlawful, nor does it refer to any law violated by the Board in imposing a statewide test. Accordingly, we find no legal basis for any reversal. Similarly, we reject Verizon's contention that the Board's statewide-bottleneck test is unreasonable because it is inconsistent with its imputation rule, which is applied on a service-by-service basis. Verizon points to no legal basis for its claim that such an inconsistency, even if unsound policy, requires reversal.

Finally, we note that the Board also states in its decision that "any incumbent, remains, of course, free to request the Board to find that a

particular facility is no longer a bottleneck (throughout its service territory or in more narrowly defined geographies)." Indeed, Verizon concedes in its brief that this language leaves open the possibility that Verizon could prove that a facility is not a bottleneck in a specific limited geographic area and thereby not be required to impute the bottleneck price in its retail price. It complains, however, that the Board's decision offers little guidance on how Verizon can meet this test and, thus, Verizon has little optimism that it will be able to overcome the Board's broad definition of a bottleneck facility even in Chittenden County where there is significant competition. Needless to say, we do not reach these hypothetical issues because they are not properly before us in this case.

### III. Volume Discounts

■ Verizon contends that the Board has unlawfully prohibited Verizon from entering into toll special contracts contrary to the specific mandate of 30 V.S.A. § 229. Under 30 V.S.A. § 229, utilities are prohibited from offering customers any discount or deviation from their tariffed rates. With the prior approval of the Board, however, utilities may enter into a contract to furnish "any special product or special service not provided for or covered in the schedule." 30 V.S.A. § 229. In this case, Verizon sought Board approval for three toll special contracts. The Board ruled, however, that volume discounts should not be offered in special contracts under § 229 but should be offered in tariffed volume-based discounts available to all customers to ensure that rates do not unjustly discriminate between similarly situated customers in violation of 30 V.S.A. § 218.

The Board found that the sole difference between the three toll special contracts and the tariffed services was price and volume, and that the selective offering of such discounts unjustly discriminated between customers. It concluded that simple volume discounts should not be offered in selective special contracts but rather in tariffed volume-based discounts available to all customers. Such discount tariffs would largely obviate the need for toll special contracts, reducing the Board's burden in approving all such contracts, and ensure that Verizon does not unjustly discriminate between similarly situated customers. Further, the Board concluded that tariffed discount rates will allow competitors to purchase the services at discount for resale. On the other hand, the Board ruled that toll special contracts would be permitted when the customer's usage characteristics are fundamentally different from those of the typical

customer of similar usage that would be covered in the volume-based discount tariff.

Verizon contends that the Board's blanket disapproval of toll special contracts is contrary to the option that the Legislature has provided to utilities in § 229. Section 229, however, prohibits any discounts from tariffed rates and requires Board approval for special services. The Board concluded that the services at issue here were not special, but simply volume discounts and thus violate § 218 unless offered in tariffed schedules to all customers. Verizon's conditional right to seek to enter special contracts under § 229 does not trump its statutory duty to offer nondiscriminatory rates to all customers. Moreover, the Board's disapproval of toll special contracts was not complete; it allowed for toll special contracts when the services contracted are indeed "special," or fundamentally different from those of other customers with similar volume usage. We find no clear error in the Board's ruling.

Verizon also maintains that the Board has prohibited it from entering into toll special contracts while leaving its competitors unfettered, and that this ruling is based on the faulty assumption that Verizon has a monopoly on toll services. We disagree. The Board noted that the toll market is increasingly competitive but that Verizon's position as incumbent still provides benefits that support different treatment. The Board's decision, however, was based on the lack of any evidence that competitors were making use of toll special contracts. Indeed, the Board noted that it had not approved any toll special contracts for Verizon's competitors, which, as the Board found, shows that the competitors are not using toll special contracts but are using tariffs with volume discounts. Thus, we reject Verizon's contention that the Board has subjected it to unjustified disparate treatment on the basis of an erroneous assumption that it has a monopoly on toll services.

## IV. Conclusion

The essence of Verizon's claim of error in this matter was well stated in its brief:

> The imputation rules and restrictions on special contracts adopted by the Board in its Order all reflect the reality of days gone by, when utility services were considered natural monopolies and one provider controlled all aspects of the market under the regulatory auspices of the PSB. For a variety of reasons explained below, the Board's pricing rules

are in error. The fundamental error, however, is the Board's failure to recognize and treat consistently the overwhelming facts in the record before it that show that the business toll services market and the business exchange services market (the two markets that are the subject of the special contracts at issue) have become competitive and that [Verizon] exerts monopoly power over neither.

Even assuming arguendo the merits of Verizon's characterization — that the Board's rules and restrictions are relics of "days gone by" — the issue before us is not the soundness of the Board's policy choices but the legality of its decision. Verizon must do more than demonstrate that the Board's decision is unwise; it must demonstrate that the Board's findings and conclusions are clearly erroneous. It has not done so here.

*Affirmed.*